Forest BLACKSTOCK et al., Appellants,

v.

Lewis L. GRIBBLE, Appellee.

No. 3347.

Court of Civil Appeals of Texas.

Eastland.

March 21, 1958.

Rehearing Denied April 11, 1958.

Jameson, Whitten, Harrell & Wilcox, Abilene, for appellants.

Tom Gordon, Bradbury, Tippen & Brown, Smith, Bickley & Pope, Abilene, for appellee.

COLLINGS, Justice.

This suit was brought by Lewis L. Gribble against Forest Blackstock, J. B. Harrell, Jr., and Nelson Clabaugh. Mr. Clabaugh is

now deceased and all of his interest in the matters in controversy has been acquired and is now held by Forest Blackstock. Plaintiff alleged that in February of 1953 a partnership, known as Big State Tool Company, was formed by plaintiff and the named defendants for the purpose of engaging in the business of oil field testing and cementing service. The partnership continued until February of 1954 when a dissolution agreement was entered into between the parties providing a method of settling the partnership affairs. Plaintiff alleged that the plan provided in the agreement for dissolution of partnership was not followed; that there had been no accounting and distribution and no opportunity for a division of the assets in kind as contemplated by the agreement; that on the contrary defendants had notified plaintiff that the assets of the partnership would be sold and the money received applied to the payment of the partnership debts prior to the completion of an audit, and that there was consequently no dissolution under the agreement. Plaintiff further alleged that the assets of the partnership included an oil and gas lease known as "The Berry Lease". Plaintiff asked for a dissolution of the partnership, an accounting of the partnership affairs, the appointment of a receiver and the recovery of an undivided one-twelfth interest in the producing oil lease referred to as the "Berry Lease". Defendants answered resisting the appointment of a receiver. They filed a cross action against Gribble asking specific performance of the contract of dissolution insofar as it related to the sale by Gribble of his interest in the "Berry Lease". The accounting phase of the case was heard and determined by the court without a jury. The remaining issues were tried before a jury which found that an audit of the books of the partnership was not completed before the sale of any of its assets, and that an accounting and distribution of the assets and liabilities of the partnership on the basis of ownership as provided in the agreement of dissolution was never undertaken by the parties before the sale of any of the assets of the partnership. The jury further found that it was understood and agreed between the partners that the Berry Lease would be acquired for the partnership. The court found that the partnership was not dissolved according to the terms of the agreement of dissolution, but that a different method of liquidating the assets was used, and that the agreement, therefore, did not effect a dissolution. Judgment was entered dissolving the partnership as of the date of the judgment, stating the accounts and decreeing title to one-twelfth interest in the Berry Lease to Lewis L. Gribble. Defendants Harrell and Blackstock have brought this appeal.

The evidence shows that the parties to this suit entered into a partnership on February 23, 1953. The agreement for dissolution was dated February 18, 1954. This agreement recited the respective interests of the partners in the business as follows: Gribble a ⅓rd interest, J. B. Harrell a ⅓rd interest, Forest Blackstock a ⅙th interest and Nelson Clabaugh a ⅙th interest, which interest is now held by Blackstock. It was agreed between the parties that the partnership was to be dissolved effective as of 7 o'clock p. m., February 18, 1954, and that Gribble would immediately deliver to the other partners all tools, supplies, equipment, checks funds and property of any nature belonging to the partnership. It was agreed that there would be a division of the partnership assets to be accomplished as follows: the other partners agreed to deliver to Lewis L. Gribble all of the books, records and other papers pertaining to the Big State Tool Company within three days in order that he might have an audit made. It was provided that upon completion of the audit an accounting and distribution of the assets and liabilities of the company should be made on the basis of ownership as above stated. It was further provided, however, that in the event the parties were unable to agree upon a distribution "in kind of the assets" that the affairs of the partnership should be finally settled in this manner: that Lewis Gribble should submit to the other partners a written statement of the

value placed by him on the assets of the partnership as a whole and offer to buy the interest of his partners or sell his interest to them on the basis of such value. It was agreed that the other partners should, within ten days after receipt of such offer, notify Lewis Gribble in writing whether they would sell their interest or buy the interest of Gribble on the basis of his offer. It was further agreed that the party selling should be released of all liability on any partnership obligations. The dissolution agreement also contained the following provision:

"It being agreed and understood by all parties hereto that an undivided interest in a certain oil and gas lease situated in Callahan County, Texas, known by the parties hereto as the Berry Lease shall not be considered as an asset of the Big State Tool Company in the settlement of its affairs. However, the other parties hereto agree with Lewis L. Gribble that they will pay to him at the time the final settlement of the partnership affairs is made as provided for herein, the sum of $10,750.00 for his contingent interest in said Berry Lease, and Lewis L. Gribble whil at the time execute and deliver to the other partners a quit-claim conveyance of all his claim or interest in and to said Berry Lease and the personal property thereon."

The property referred to as "The Berry Lease" is now a valuable producing oil and gas lease. At the time of the purchase of the ¼th interest here in controversy the lease was undeveloped. At the time of the agreement for dissolution oil had been found and was being produced from the lease, but the income therefrom was still about $20,000 less than the original purchase price and cost of development. There was and is a sharp controversy as to whether the ¼th interest in the Berry Lease was purchased as and became a part of the partnership assets. The jury found that at the time of the acquisition of the Berry Lease it was understood between the par-

ties that the lease would be acquired for the partnership. Appellants' complaint of this finding will be considered later. In any event it is obvious that Gribble was at the time of the dissolution agreement claiming an interest in the lease and that the agreement provided for a settlement of that claim.

In appellants' first point it is contended that the court erred in decreeing title in appellee to an undivided ⅓rd of the ¼th interest in the Berry Lease and in refusing to sustain appellant's motion for judgment non obstante veredicto granting specific performance of the provision of the contract of dissolution pertaining to the sale of appellee's contingent interest in the lease.

Appellants urge that the contract of dissolution of February 18, 1954, deals with two separate and distinct matters and is severable. They urge that the first part of the contract concerned the dissolution of the partnership and provided a method for settlement of the partnership affairs; that the contract stipulated that the Berry Lease was not to be considered as an asset of the partnership. Appellants contend that as a separate and distinct part of the contract and for a stated consideration the parties contracted for the sale to appellants of appellee's contingent interest in the Berry Lease. Appellants urge that the portion of the contract pertaining to the sale and purchase of said lease is wholly distinct and severable from the remainder of the contract. They alleged and here contend that Gribble failed and refused to perform the first part of the contract dealing with the settlement of the partnership affairs. They contend that the fact that the first part of the contract has not been carried out and cannot at this time be specifically enforced, does not affect appellants' right to enforce that portion of the contract providing for appellee's sale to appellants of his interest in the Berry Lease.

■ The intention of the parties as determined by the language used in a contract is controlling in determining whether

the contract is severable or is entire and indivisible. Smith v. Crosby, 47 Tex. 121; 17 C.J.S. Contracts §§ 333, 334, pp. 789, 790; 10–A Tex.Jur. pp. 396, 402, 403.

 Appellee did agree to sell his interest in the Berry Lease to appellants for a consideration of $10,750. This agreement, however, was a part of the agreement for dissolution of the partnership. The agreement for dissolution provided a method for the liquidation and distribution of the assets of the partnership, and provided that at the time of the final settlement of the partnership affairs "as provided herein" Gribble would sell and convey to appellants his interest in the lease. The sale of the lease was to be made at the time of the "final settlement". The "final settlement" at which the sale was to be made was a settlement "as provided herein", that is, a settlement by the method provided. The language of the contract indicates that the provision for the sale by appellee of his interest in the Berry Lease to appellants was contingent upon a final settlement of the partnership affairs in the manner provided by the contract and that such a settlement was a condition precedent to appellee's promise to sell. This language shows an intention of the parties that the contract should be entire and indivisible, and not severable.

It is undisputed that there was not a settlement of the partnership affairs in the manner provided by the contract and that such a settlement is now impossible. A substantial part of the assets of the partnership was sold before an audit of the books was completed. The sale was necessary because mortgage holding creditors were demanding payment under threats of foreclosure. But, because of the sale, it became impossible for the parties to follow the procedure for the distribution of the assets provided in the contract. The rule is stated in 38 Tex.Jur. 501, as follows:

"Generally, specific enforcement of a contract will not be ordered unless it can be completely enforced so as to secure substantially all that the parties contemplated at the time of making the agreement. Hence, where the court is unable to decree performance of the whole contract, it will not interfere to enforce any part of it." Also see 38 Tex.Jur. 434.

By the terms of the contract for dissolution appellee was entitled to an opportunity to make a give-or-take offer for the assets of the partnership after a complete audit of the books and before a sale of any of the assets. The business operated by the partnership, although burdened with considerable indebtedness, was a going concern at the time and we cannot say that the opportunity provided appellee by the contract to make such a give-or-take offer was not a substantial part of the consideration for his promise to sell the Berry Lease. Actually, the specific language of the contract was to the effect that his agreement to sell the Berry Lease was conditioned upon a settlement of the partnership "as provided" therein. In the face of this specific language we are unable to say that the expressed condition was not a material part of the consideration for appellee's promise to sell.

 Appellants are seeking to enforce and to specifically perform a part of the contract which we hold the parties intended to be entire and indivisible. It is undisputed that another part of the contract which, except for the express terms of the contract to the contrary is capable of being severed from the part sought to be enforced, is impossible of performance. If, as appellants urge, the failure or impossibility of a final settlement and distribution of the assets in the manner provided by the contract was a result of a breach or default on the part of appellee, then appellants would be entitled to specific performance of appellee's agreement to sell his interest ing the Berry Lease. The court found in its judgment that appellee was not responsible for the failure to carry into effect the agreement of February 18, 1954. Appellants contend that this finding by the court

was improper and ineffective because there was a jury and all fact issues should have been determined by the jury. If this were a fact issue which appellee had the burden to establish to justify the judgment in his favor and the evidence was conflicting the contention would be well taken. We doubt if there is any conflict in the evidence on this issue which has not been passed upon by the jury. Under the terms of the contract Gribble had no duty to perform, and in fact was unable to proceed according to the method of dissolution provided until the audit of the books was complete. The jury found that the audit was not completed before the sale of any of the assets. We doubt if there was any evidence to the effect that Gribble was responsible for the delay in the completion of the audit. But, in any event, appellants, who rely upon a breach by appellee as a basis of recovery, had the burden to establish the existence of such breach or default. 17 Tex.Jur. 316; Christoph v. Sims, Tex.Civ. App., 234 S.W.2d 901, 903 (Writ Ref.). No such breach or default by appellee has been established. The evidence shows that a sale of a substantial part of the assets of the partnership was necessary to prevent a forced sale by mortgage holding creditors. The sale was before the completion of the audit. This was the cause of the impossibility of performance. There is no finding, and, if there was any evidence, it does not conclusively show that Gribble was responsible for the failure to complete the audit before the sale of the assets. On the contrary, there is evidence to the effect that the delay in the completion of the audit was due to the delay of appellants in furnishing complete information concerning the company's affairs. The testimony of the accountant who prepared the audit was to that effect and we have found no evidence to the contrary. Appellants have not discharged their burden of showing that the delay in the audit or the failure to make a distribution of the assets "as provided" was the fault of or was due to any breach or default on the part of Gribble.

Appellants also urge that the appellee knew of and participated in all sales that were made and, as we understand, contend, in effect, that appellee consented to the sale of the assets before the completion of the audit and thereby waived his right to urge the impossibility of a distribution as provided in the contract as a defense to appellants' right to specific performance of appellee's promise to sell the Berry Lease. We cannot agree with this contention. The evidence indicates that the sale of some of the mortgaged property was necessary to prevent a forced sale and to protect and preserve the assets of the partnership. The fact that appellee participated in the sale of some of the partnership property could mean merely that he recognized the impossibility of performance of the terms of the contract relating to the distribution of the assets. His participation in the sale under these circumstances does not show, or does not conclusively show an intent to waive any condition precedent to his promise to sell the Berry Lease for $10,750. Appellee is not seeking to enforce the contract in any respect. Appellants are seeking specific performance of a portion of the contract and seek to uphold it because of a claimed waiver by appellee of a condition precedent which had become impossible of performance. The burden was on appellants to establish the waiver. 43-B Tex. Jur. 490. There is no finding, nor is there conclusive evidence of such a waiver. Appellants' contention concerning a claimed breach, default or waiver by appellee is in the nature of a claim of estoppel, that is, that appellee is responsible for, or acquiesced in, any action or course of procedure which brought about, or caused, the impossibility of performance of the provisions of the contract concerning the method of settlement and distribution, and, therefore, cannot complain of or urge such impossibility of performance as a defense to appellants' suit for specific performance of the remaining part of the contract. 17 Tex.Jur. 130, 131. The burden was on appellants to establish the claimed breach,

default or waiver. 17 Tex.Jur. 147. There was no finding or conclusive evidence of such a breach, default or waiver by appellee.

Special issue number 2 of the court's charge is as follows:

"Do you find from a preponderance of the evidence that an accounting and distribution of the assets and liabilities of Big State Tool Company on the basis of ownership of the partners, as provided in the Agreement dated February 18, 1954, was never undertaken by either of the parties, before the sale of any of the assets of Big State Tool Company?"

■ We overrule the contention that the court erred in submitting this issue over appellants' objection that the issue called for the jury to pass on the construction to be placed upon the contract. The contract of dissolution specified the proportional ownership of each partner and provided for an accounting and distribution of the assets and liabilities on the basis of ownership as therein stated. The language "as provided in the agreement" as used in special issue number 2 does not have the effect of asking the jury to interpret the contract. This language obviously referred to the "basis of ownership". The contract set out the interest owned by each of the partners and there is no controversy about the matter. The effect of special issue number 2 was simply to inquire whether an accounting and distribution on the basis of ownership was not undertaken before the sale of the assets. The special issue did not request any interpretation by the jury of the terms of the contract.

It is undisputed that the legal title to the Berry Lease was in F. C. Blackstock and J. B. Harrell by virtue of a duly executed assignment. Appellee contends, however, that the lease is a part of the partnership assets. He alleged and here contends that the circumstances and conditions under which the lease was obtained, and the actions of the parties, show that the lease was acquired and held in the name of appellants in trust for and as an asset of the Big State Tool Company; that such facts and circumstances are sufficient to impress a trust on the lease in favor of the partnership. Appellants denied that the lease was or is an asset of the partnership. They contend appellee's efforts to impress a trust on the lease is in violation of the statute of frauds and the Texas Trust Act. The jury found in answer to special issue number 3 that it was understood between the parties that the Berry Lease would be acquired for the partnership. In numerous points appellants complain of this finding and of the evidence tending to show that the lease was acquired as a partnership asset. Appellants also complain of the judgment of the court decreeing that appellee had a one-third (⅓) of a one-fourth (¼) interest in the Berry Lease.

As already noted title to an undivided ¼th interest in the Berry Lease is in the name of appellants F. C. Blackstock and J. B. Harrell, Jr., by virtue of an assignment from A. T. Halbert. The purchase price of such interest was $8,000 and was paid by C. B. Drilling Company, a partnership composed of F. C. Blackstock and N. C. Clabaugh.

■ The evidence bearing upon the question of whether the Berry Lease was acquired as a partnership asset was in substance as follows: The partners, operating under the name of Big State Tool Company, owned an interest in an oil and gas lease in Callahan County known as the Dyer Lease. They became interested in purchasing the adjoining lease, known as the Berry Lease. Appellee Gribble began negotiations to obtain the lease with the knowledge and consent of the other partners. Appellant Blackstock had made an effort to secure the lease but was unsuccessful. Gribble then continued efforts to secure the lease. After considerable negotiation he wrote a letter which purported to be from the Big State Tool Company signed by him and addressed to the owner of the lease, Mr. A. T. Halbert, proposing the as-

signment of a one-fourth interest in the lease. The letter by Gribble recited the sale and the purchase of the lease for $8,000 and bore Halbert's signature of acceptance. It was introduced in evidence over appellants' objection and is as follows:

"Abilene, Texas
"June 5, 1953

"Re: John Berry and wife, Thelma Berry, Lease, covering 640 acres out of Surveys Nos. 55, 56 and 58, BBB & C Ry. Company Lands, Callahan County, Texas.

"Mr. A. T. Halbert
"Abilene, Texas

"Dear Mr. Halbert:

"It is our understanding that you propose to drill a test well to a depth of approximately 2200 feet, or to commercial production at a lesser depth on the Northwest 160 acres of the above described 640 acre lease.

"This will confirm our previous verbal agreement whereby we agreed to pay you $8,000.00 cash for an undivided one-fourth interest in said lease and well, same to be free of any costs to us to the sand/or casing point. On all other wells we are to bear our pro rata share of all operating, drilling and completion costs. It being further understood and agreed that you are the operator of said lease irrespective of the number of wells drilled thereon.

"We will deposit said $8,000.00 in escrow, along with a copy of this letter, and the F & M National Bank, Abilene, Texas, is hereby authorized to deliver said $8,000.00 to you upon your reaching the contract depth, or production at a lesser depth.

"If this is your understanding of our agreement, please indicate your acceptance thereof in the space below provided.

"Yours very truly,
"Big State Tool Company
"By /s/ Lewis L. Gribble

"The above is my understanding of our agreement.

"/s/ A. T. Halbert
"(A. T. Halbert)"

There was evidence to the effect that the above letter addressed to Halbert was known of and approved by the other partners. Gribble testified that Blackstock got a copy of the letter; that it was the understanding of the parties that he, Gribble, was to have an interest in the lease upon its acquisition. There is evidence to the effect that it was through Gribble's efforts that the lease was obtained; that after Gribble had carried negotiations to the point of closing the trade Blackstock "took over" and did the closing. Gribble testified that he had nothing to do with the preparation of the assignment to Blackstock and Harrell and later discovered that the lease was not made to Big State Tool Company as he had thought it would be. The evidence also shows that the assignment of the lease was prepared under the direction of Blackstock and that the grantees in the assignment were Harrell and Blackstock. Although the $8,000 consideration was paid by C. B. Drilling Company the payment was charged on the books against Big State Tool Company, which at the time did not have a bank account of its own but was handling its affairs through the bank account of the C. B. Drilling Company. Appellants concede that transactions involving the purchase and development of the Berry Lease were "run through" the partnership books, but contend that this was done as a matter of convenience to "save establishing an additional set of records". It is undisputed that neither Lewis L. Gribble nor the Big State Tool Company paid any part of the purchase price of the lease, but that the full price of $8,000 was paid by C. B. Drilling Company and that J. B. Harrell, Jr., thereafter paid to the C. B. Drilling Company $4,000 to be applied on such purchase price.

█ Appellants contend that the court erred in admitting any evidence to show the

ownership of an interest in the Berry Lease by appellee Gribble. They urge that such evidence was an effort to vary the terms of the contract of dissolution, which provided in effect that it was agreed and understood between the parties that the Berry Lease should "not be considered as an asset of the Big State Tool Company in the settlement of its affairs". We cannot agree with this contention. The language quoted was a contractual provision of an entire and indivisible contract to settle the partnership affairs which became ineffectual because a material part of the contract was impossible of performance.

Appellants further objected to the admissibility of all of the evidence tending to show appellee's ownership of an interest in the Berry Lease because legal title to the lease was vested in appellants under a duly executed assignment and that any evidence tending to show ownership of an interest therein by appellee was an attempt to vary the terms of the assignment. Appellee contends that the evidence in question was admissible to show either a constructive or a resulting trust on the Berry Lease in his favor.

The question of constructive trusts is discussed at length in the Texas Supreme Court case of Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256, 262. In that case Justice Griffin quotes from Restatement, "Restitution", p. 640 et seq., as follows:

" 'Sec. 160. Constructive Trust.

" 'Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.'

\* \* \* \* \* \*

" '*Constructive Trusts.*

" 'Sec. 1044. *Generally.* Constructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working

out justice in the most efficient manner, where there is no intention of the parties to create such a relation, and in most cases contrary to the intention of the one holding the legal title, and where there is no express or implied, written or verbal, declaration of the trust. They arise when the legal title to property is obtained by a person in violation, express or implied, of some duty owed to the one who is equitably entitled, and when the property thus obtained is held in hostility to his beneficial rights of ownership. \* \* \* An exhaustive analysis would show, I think, that all instances of constructive trusts properly so called may be referred to what equity denominates fraud, either actual or constructive, as an essential element, and as their final source. \* \* \* This notion of fraud enters into the conception in all its possible degrees. Certain species of the constructive trusts arise from actual fraud; many others spring from the violation of some positive fiduciary obligation; in all the remaining instances there is, latent perhaps, but none the less real, the necessary element of the unconscientious conduct which equity calls constructive fraud. \* \* \*' Pomeroy Equity Jurisprudence, 'Constructive Trusts', vol. 4, p. 93, § 1044.

\* \* \* \* \* \*

"Restatement 'Restitution', Sec. 194, p. 795, et seq., Sec. (2) declares the law to be: '(2) A person who agrees with another to purchase property on behalf of the other and purchases the property for himself individually holds it upon a constructive trust for the other, even though he is not under a duty to purchase the property for the other."

■ In our opinion the evidence complained of, as hereinabove substantially set out, was not inadmissible on the grounds urged by appellants, but on the contrary,

was sufficient to establish a constructive trust as contended by appellee. Appellee and appellants were partners and the relationship between them was fiduciary in character. The evidence supports the finding of the jury that it was understood between the parties that the Berry Lease would be acquired in the name of the Big State Tool Company. It is undisputed that appellant Blackstock, one of the partners, secured an assignment placing title to the lease in himself and Harrell. Under these circumstances appellants are, in equity, regarded as trustees and hold the legal title, acquired by virtue of the assignment, in trust for the benefit of all three partners. Fitz-Gerald v. Hull, supra.

We cannot agree with appellants' contention that Gribble's letter to A. T. Halbert and his acceptance thereof which constituted the contract for the purchase of the Berry Lease was inadmissible on the ground that the recitals therein were self-serving declarations by Gribble in violation of the parol evidence rule. This letter or contract was concurrent with and a part of the very transaction by which the purchase of the one-fourth interest in the Berry Lease was consummated. The letter was not the narration of a past transaction; it was part of the res gestae and was material on the question of intention of the parties at the time of the purchase of the lease from Halbert.

We are likewise unable to agree with appellants' contention in effect that none of the above evidence of a constructive trust is admissible because there was no pleading of fraud. Appellee alleged that the lease was obtained under circumstances and conditions which show that the lease was acquired and held in the name of appellants in trust as an asset of the partnership. This pleading was a legal conclusion, but it was sufficient in the absence of an exception complaining of the generality of the allegation. Rule 45, Texas Rules of Civil Procedure.

The auditor's report covering the operations of the Big State Tool Company give appellee Lewis L. Gribble an initial capital credit of $30,000 for two strings of test tools and a credit of $15,000 for a third string of test tools brought into the company after the partnership was formed. Appellants urge in their fourth point that the trial court erred in entering judgment based upon the report of the auditor as above set out because the audit is contrary to the written partnership agreement. The partnership agreement recited that the partnership property was owned 1/3rd by appellee Gribble, 1/3rd by Blackstock and Clabaugh and 1/3rd by Harrell. Appellants urge that in giving Gribble credit for a $30,000 contribution to the capital assets on his interest in the two strings of test tools the court has given him credit for $20,000 more than he is entitled to under the partnership agreement. Appellants also urge that the court erred in giving Gribble credit for $15,000 for the third string of tools because the evidence shows that he was to look to profits of the partnership for payment of this string of tools and the greatest credit which he could possibly have on the basis of this item would be $5,000, the amount the tools brought when sold. We cannot agree with this contention. The facts are that Gribble owned the entire interest in the two strings of test tools which were valued at $30,000. It was provided in the partnership agreement that the partners were each to have a 1/3rd interest in all of the assets as above set out. Since Gribble was to have only 1/3rd interest in the partnership assets, he was given credit for $10,000 as a contribution to capital assets, but he was entitled under the contract to be compensated for the remaining $20,000. The court did not err in giving him credit for $30,000, which is the value that he actually contributed to the partnership in the two strings of test tools. Appellee was also entitled to be given credit for the $15,000 value of the third string of test tools which he contributed to the partnership. Appellants' fourth point is overruled.

Appellants contend the court erred in refusing to charge Gribble with one-third of the loss suffered on the Jaster and Burnam Leases. These leases were a part of the partnership assets. The expenses and losses in connection therewith were chargeable to the partners. As we understand, the audit considered these leases as partnership assets and covered the transactions resulting in the loss in connection with the leases. The court found that the audit was correct, approved it and entered judgment based thereon. If the audit is correct appellee has, as one of the partners, shared in the loss suffered on these leases. We have not been pointed to, nor have we been able to find any error in the audit in this connection.

 In the judgment of the court it was found that "said partnership was not dissolved under the provisions of the agreement dated February 18, 1954, but that a different method and system of liquidating the affairs of the partnership was followed by the partners and that the partnership continued and it is being dissolved by this judgment". Appellants contend that the court erred in finding the partnership was not dissolved on February 18, 1954, and in rendering judgment based on such finding. Appellants urge that the finding is in conflict with a provision of the contract of dissolution which is as follows:

"That the partnership firm of Big State Tool Company shall be and is hereby dissolved effective as of 7 o'clock p.m., February 18, 1954."

As previously noted the contract of dissolution was an entire and indivisible contract. When it became impossible of performance all of its provisions became ineffective. The trial court correctly found that the partnership was not dissolved under the provisions of the dissolution contract. The evidence showed conclusively that a different method of liquidating the partnership affairs was followed. The evidence shows that the partnership business was continued after the date of the contract and that it was operated at a loss during that period. Appellee was charged with ⅓rd of these losses. Under these circumstances we are unable to see how appellants have suffered any injury and could be entitled to complain. The point is overruled.

The judgment of the trial court is affirmed.

WALTER, J., disqualified and not sitting.